# UNITED STATES DISTRICT COURT
for the
Eastern District of Wisconsin

In the Matter of the Search of:

APARTMENT #5, THE DETACHED GARAGE AND
VEHICLES ASSOCIATED WITH THAT
APARTMENT LOCATED AT 2811 UNIVERSITY
AVENUE, GREEN BAY, STATE AND EASTERN
DISTRICT OF WISCONSIN

)
)
)
)
)
)

Case No. 20 M 733

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property:

Property described as: A WARRANT AUTHORIZING THE SEARCH OF APARTMENT #5, THE DETACHED GARAGE AND VEHICLES ASSOCIATED WITH THAT APARTMENT LOCATED AT 2811 UNIVERSITY AVENUE, GREEN BAY, STATE AND EASTERN DISTRICT OF WISCONSIN, described in Attachment A, incorporated herein.

over which the Court has jurisdiction pursuant to Title 18, United States Code, Sections 2703 and 2711, there is now concealed:

See Attachment B, incorporated herein.

The basis for the search under Fed. R. Crim P. 41(c) is:

☒ evidence of a crime;
☒ contraband, fruits of crime, or other items illegally possessed;
☐ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to violations of: which constitutes evidence of Title 21, United States Code, Sections 841 and 846, and Title 18, United States Code, Sections 1956 and 1957, and Title 18, U.S.C. Sections 922 and 924, conspiracy to distribute and possession with intent to distribute controlled substances and associated money laundering crimes, and firearm possession in furtherance thereof.

The application is based on these facts: See attached affidavit.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days:_____) is requested
under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____  10·06-2020 / 1:09 PM
Applicant's signature

Ryan Meader, FBI TFO
Printed Name and Title

Attested to by the applicant in accordance with the requirements of Fed. R. Crim P. 4.1 by
TELEPHONE (specify reliable electronic means):
Date: 10/6/2020

_____
Judge's signature

City and State: Green Bay, Wisconsin

JAMES R. SICKEL, U.S. Magistrate Judge
Printed Name and Title

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF WISCONSIN**

---

IN THE MATTER OF THE APPLICATION FOR A WARRANT AUTHORIZING THE
SEARCH OF APARTMENT #5 AND THE ASSOCIATED DETACHED GARAGE
LOCATED AT 2811 UNIVERSITY AVENUE, GREEN BAY, WISCONSIN. 2811
UNIVERSITY AVENUE IS A MULTI-UNIT APARTMENT BUILDING WITH BRICK
EXTERIOR WITH THE NUMBERS "2811" IN BLACK NUMBERING ON THE EXTERIOR
OF THE BUILDING. APARTMENT #5 IS LOCATED ON THE SECOND FLOOR OF THE
BUILDING. APARTMENT #5 ALSO HAS A GARAGE LOCATED ON THE FIRST FLOOR
OF THE BUILDING. BOTH THE GARAGE AND THE LIVING AREA HAVE A #5, BRASS
IN COLOR AFFIXED TO BOTH THE MAIN ENTRY DOOR INTO THE APARTMENT,
AND THE MAIN ENTRY DOOR INTO THE GARAGE FROM THE COMMON HALLWAY
TO THE BUILDING. THIS PREMISES LOCATION ALSO INCLUDES SEVERAL
VEHICLES AND A MOTORCYCLE SUBJECT TO SEARCH.

---

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

---

I, Ryan Meader, being first duly sworn on oath, depose and state as follows:

1. I am an investigative or law enforcement officer of the State of Wisconsin within the meaning
   of Wis. Stat. § 968.27(10), in that I am empowered by the laws of the State of Wisconsin to
   conduct investigations of and to make arrests for violations of the laws that I am employed to
   enforce including those offenses enumerated in Wis. Stat. §§ 961.

2. I am currently a federally deputized law enforcement officer, under the authority and
   agreement from the Federal Bureau of Investigation, and assigned as a Task Force Officer,
   to conduct drug investigations in violation of Title 21, United States Code. As such, I am
   an "investigative or law enforcement officer of the United States" within the meaning of
   Title 18, United States Code, Section 2510(7), that is, an officer of the United States, who
   is empowered by law to conduct investigation of, and make arrests for, controlled substance
   offense enumerated in Title 21, United States Code.

1 | P a g e

3. I have been employed by the Green Bay Police Department as a full time sworn law enforcement officer since November 18, 2002. I am currently assigned as a Narcotic Investigator with the Brown County Drug Task Force. I am an active member of the Green Bay Police Departments Gang Task Force since 2009. During this time I have attended training in the basics of Gangs and their cultures, structures, and investigations. I have also attended Gang and Drug Investigations training put on by Janesville Police Street Crimes Unit. I have attended 40 hours of specialized clandestine laboratory training from the Drug Enforcement Administration, specifically in the investigation of methamphetamine laboratories, is a member of the Clandestine Laboratory Enforcement and Response Team and has investigated clandestine drug labs. I have been trained through Operation Jet way, an advanced interdiction training conducted by the DEA. I have received training in Working with Confidential Informants, and Interview and Interrogation. I have received on the job training in regards to robbery, battery, drug identification, evidence collection, video/visual/audio surveillance, and search warrant executions. I have been a member of Native American Drug and Gang Initiative (NADGI) supervised by State of Wisconsin DCI. I have prepared numerous affidavits for state search warrants to include title III wire, oral, and electronic communications intercepts; I have also been involved in the execution of numerous search warrants. I have interviewed suspects and confidential informants about their experiences and knowledge of gangs, drug use, and distribution. Through such experience, I am familiar with the nature of drug trafficking, criminal street gangs and the behavior and patterns of those involved in using and distributing controlled substances. I have worked with numerous informants in the investigation of drug trafficking to provide information and make controlled purchases of drugs. I am familiar with the street names

of various drugs in Wisconsin, as well as the methods that are commonly used by drug dealers to package, ship and prepare controlled substances for sale or use in Wisconsin.

4. The facts in this affidavit come from the Brown County Drug Task Force (BCDTF), Federal Bureau of Investigation (FBI), the Drug Enforcement Administration (DEA), other law enforcement agencies, and witness statements, all of which I believe to be truthful, in addition to my personal observations, training and experience. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

5. Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that CARLOS LUIS RAMIREZ-MORALES; M/H; DOB: 11/04/1985 also known as "RAMIREZ-MORALES", has committed violations of Title 21 U.S.C. § 846, 841(a), (b)(1)(A) (conspiracy to distribute and possess with the intent to distribute cocaine and heroin) and that evidence of such conduct will likely continue to be obtained by searching the premises of 2811 University Avenue, apartment # 5, (Subject Premises) in the City of Green Bay, County of Brown, and State and Eastern District of Wisconsin as further described in Attachment A with items to be seized in Attachment B.

6. Based on my training, experience, and my participation in drug trafficking investigations and associated financial investigations involving large amounts of marijuana, methamphetamine and/or other controlled substances, I know and have observed:

      a.    that people involved in drug trafficking and/or money laundering almost always keep records of their transactions; because drug trafficking generates large sums of cash, it requires the keeping of detailed records as to the purchase and distribution of drugs as well as the laundering of the proceeds; drug traffickers and money launderers typically keep documents demonstrating the purchase of assets, as well as bank records and other evidence of the accumulation of wealth through illegal activities, as well as the methods used to launder the proceeds; such records also typically

provide evidence as to the identity of additional criminal associates who are facilitating the laundering of the drug proceeds on behalf of the organization; these records, unlike the controlled substances, are often maintained for long periods of time; such records are often maintained under the dominion and control of the drug traffickers and money launderers, and as such, are often kept in their residences, businesses, or other locations that they control;

b.      that drug traffickers often purchase and/or title their assets in fictitious names, aliases or the names of relatives, associates or business entities to avoid detection of these assets by government agencies;

c.      that even though these assets are in names other than the drug traffickers, the drug traffickers actually own and continue to use these assets and exercise dominion and control over them;

d.      that drug traffickers must maintain on-hand large amounts of U.S. currency in order to maintain and finance their ongoing drug business;

e.      that it is common for drug traffickers to maintain books, records, receipts, notes, ledgers, airline tickets, receipts relating to the purchase of financial instruments and/or the transfer of funds, and other papers relating to the transportation, ordering, sale and distribution of controlled substances; the aforementioned books, records, receipts, notes, ledgers, etc., are maintained where the drug traffickers have ready access to them;

f.      that it is common for drug dealers to secrete contraband, controlled substances, proceeds of drug sales and records of drug transactions, asset purchases and other items noted in the Attachment to this warrant in secure locations within their residences, storage lockers and/or garages associated with their residences, businesses, vehicles and/or other locations over which they maintain dominion and control, for ready access and to conceal these items from law enforcement authorities;

g.      that in order to accomplish this concealment, drug traffickers frequently build stash places within their residences or business; there are a number of publications available instructing where and how to build stash places; copies of these types of publications have been found in the residences of drug traffickers;

h.      that it is common for persons involved in drug trafficking to maintain evidence pertaining to their obtaining, secreting, transfer, concealment and/or expenditure of drug proceeds, such as currency, financial instruments, precious metals and gemstones, jewelry, books, records, invoices, receipts, records of real estate transactions, bank statements and related records, passbooks, money drafts, letters of credit, money orders,

bank drafts, cashiers checks, bank checks, safe deposit box keys and money wrappers; these items are maintained by the drug traffickers within their residences, businesses or other locations over which they maintain dominion and control;

i.    that drug traffickers often utilize electronic equipment such as computers and cellular telephones to generate, transfer, count, record and/or store the information described in items a, c, d, e, g and h above;

j.    that when drug traffickers amass large proceeds from the sale of drugs, the drug traffickers attempt to legitimize these profits through money laundering activities; to accomplish these goals, drug traffickers often utilize domestic and international banks and their attendant services, securities brokers, professionals such as attorneys and accountants, casinos, real estate, shell corporations and business fronts and otherwise legitimate businesses which generate large quantities of cash;

k.    that the sale of controlled substances generates large quantities of United States currency in small denominations (commonly referred to as street money);

l.    that it is common for drug dealers to physically handle and count the street money after receiving it in exchange for the controlled substances, thereby leaving residue traces of controlled substances on the street money; law enforcement agencies own dogs which are trained to react to the scent of controlled substances and residue traces of controlled substances; and those trained dogs have reacted to drug tainted currency negotiated at banks and concealed in the residences, businesses, and other locations controlled by drug traffickers;

m.    that it is common for drug dealers to separate their street money by denomination and put this currency in rubber banded stacks in varying increments to facilitate quick counting;

n.    that the courts have recognized that the small and medium denominations of questionable currency, along with the manner in which the currency is handled, carried and concealed may establish probable cause that there is a substantial connection between the questionable currency and drug transactions;

o.    that the Currency Transaction Report (CTR) (IRS Form 4789) which is required to be completed and filed with the IRS by all financial institutions on every currency transaction which exceeds $10,000, causes tremendous problems for drug traffickers when they attempt to negotiate their illegal profits at a financial institution;

p.      that in order to evade the filing of a CTR, drug traffickers often (structure) their currency transactions so that no one transaction exceeds $10,000 or they provide false or misleading information in an attempt to legitimize or conceal the source and/or ownership of the currency;

q.      that drug traffickers at times become fearful that their extravagant spending habits will bring them under scrutiny by the Internal Revenue Service or other federal, state or local agencies. In order to legitimize their spending, these traffickers file tax returns reporting income commensurate with the amount of money they have spent during the year which they feel can be traced and documented by the government; the source of their income reported on these returns is usually falsely stated, misleading or generic in terms; retained copies of these returns are commonly kept by the traffickers in their residences, businesses, and other locations under the dominion and control of drug traffickers;

r.      that drug traffickers commonly maintain addresses or telephone numbers in books, papers, or cellular telephone memory, which reflect names, addresses and/or telephone numbers of their associates in the trafficking organization;

s.      that drug traffickers take or cause to be taken photographs of themselves; their associates, their property and their product; these traffickers usually maintain these photographs in their possession;

t.      that the courts have recognized that unexplained wealth is probative evidence of crimes motivated by greed, in particular, trafficking in controlled substances;

u.      that drug traffickers commonly have in their possession, that is on their person, at their residences and/or their businesses, firearms, including but not limited to handguns, pistols, revolvers, rifles, shotguns, machine guns and other weapons; said firearms are used to protect and secure a drug traffickers property. Such property may include but is not limited to drug, jewelry, drug paraphernalia, books, records and United States currency;

v.      that the techniques and practices used by drug traffickers to avoid detection by law enforcement include, but are not limited to, the use of counter-surveillance, multiple locations at which to conduct drug related activities and to keep records and drug, hidden compartments in vehicles used to hide drug and currency, the use of pagers, voice mail, cellular telephones, pay phones, and the use of numerous associates and workers to further their criminal enterprise;

w.      that drug traffickers commonly front (provide on consignment) cocaine and/or other controlled substances to their customers and associates, and

they maintain the aforementioned books, records, ledgers, and notes of these transactions, most frequently in their residences;

x.     that drug traffickers commonly use telephones whether a land line (home telephone) or cellular telephones to arrange for drug purchases or deliveries. It is also common for drug traffickers to maintain and use several cellular telephones at the same. Typically, when a drug trafficker switches to a new cellular telephone he/she will keep that phone and not destroy it. Among other reasons, the Drug trafficker will do so to maintain the list of drug related contacts that have been accumulated. gso;

y.     that drug traffickers usually keep paraphernalia for packaging, cutting, cooking, weighing and distribution of controlled substances in their residences and in a stash house locations, specifically locations used by the conspiracy to conduct these activities;

z.     that drug traffickers who conduct interstate transportation and distribution of controlled substances must therefore transport the controlled substances themselves or have couriers transport the drugs for them. Consequently, drug traffickers often keep records of such travel, including airline tickets, bus tickets, and taxi cab receipts.

## CONFIDENTIAL SOURCES RELIABILITY

7.     The information relating to drug violations described in this affidavit is predicated, in part, upon conversations with individuals in a position to be aware of the activities of RAMIREZ-MORALES and others known and yet unknown. These persons, referred to herein as CIs (Confidential Informants) and CSs (Confidential Sources), and CHSs (Confidential Human Sources) have provided valuable information about the illegal drug activities about members of the TCO and RAMIREZ-MORALES' associates and their distribution networks. The information provided by the CIs, CSs, and CHSs have proven to be reliable as described below, and much of the information provided has also been corroborated through other investigative techniques such as surveillance and telephone toll analysis. A CI's and a CHSs identity is always known to law enforcement, and the CI and

CHS agrees to provide information to law enforcement and oftentimes conduct controlled drug buys for law enforcement. A CS's identity is also generally known to law enforcement. But a CS usually wishes to provide information anonymously while not actively cooperating with law enforcement to the same extent as a CI and CHS.

8.      At various times during this investigation, the referenced CIs (1920, 1950, and 1967) and CHS 95868 have provided reliable information on the members, distribution, sources, money, weapons and vehicles utilized to further the business of the overall TCO. I or fellow investigators have been able to corroborate information provided by the CIs and CHS and have found the CIs and CHSs to be truthful and reliable in relation to the information provided on the business conducted by the TCO. Additionally, most of the CIs' information has been corroborated through independent investigations including controlled buys, interviews and recorded conversations. Some of that corroboration is further described below in the probable cause section of this affidavit.

9.      The identities of the Confidential Informants are known to me and are being kept confidential to protect their safety and the integrity of this and other investigations. The Confidential Informants and the Confidential Human Source received various forms of consideration during the course of this investigation. CI 1920 and 1967 received monetary compensation. CI 1950 received consideration towards pending criminal charges, monetary compensation in exchange for services including participation in controlled buys and providing statements. CI 1967 received consideration towards pending criminal charges in exchange for services including participation in controlled buys and providing statements. CHS 95868 is providing information to the FBI in exchange for a change in status of their immigration status.

Case 1:20-mj-00733-JRS   Filed 10/06/20   Page 9 of 37   Document 1

*CI 1920*

10.     CI 1920 has prior felony convictions and was utilized in other matters where CI 1920's

information was corroborated. For several reasons, case agents believe CI 1920 is reliable

and credible. First, CI 1920 has been providing information since approximately August

2019. Second, CI 1920's information is substantially against CI 1920's penal interest.

Third, the information provided by CI 1920 is consistent with evidence obtained elsewhere

in this investigation where CI 1920 was utilized, and/or substantial portions of CI 1920's

information have been corroborated through independent investigation, including recorded

conversations, surveillance, information from other confidential sources, and subsequent

controlled buys made by case agents. For example, CI 1920 informed case agents that

RAMIREZ-MORALES used TARGET TELEPHONE-101 to contact CI 1920, which is

confirmed by call detail records. CI 1920 has had an adequate opportunity to directly

observe the events discussed and/or has heard conversations directly from the individuals

discussed. CI 1920 has numerous narcotics convictions, and also convictions for theft,

robbery, burglary, and receiving stolen property, as well as probation violations. Finally,

CI 1920 has been paid in the past for information, however has provided this recent

information without monetary compensation. For these reasons, I consider CI 1920 to be

reliable.

*CI 1950*

11.     CI 1950's statements are believed to be reliable as they were both made against his penal

interest and later corroborated by information gathered during the course of the

investigation. Thus far, the information provided by CI 1950 has proven to be reliable and

has been corroborated by, among other things, physical surveillance activities, controlled

narcotic buys, other confidential sources, information obtained from various public databases, and consensually-recorded conversations and other investigative techniques. CI 1950's information has never been found to be false or misleading. According to law enforcement databases, CI 1950 has been convicted of Operating While Intoxicated, Possession of Drug Paraphernalia, Possession of THC, Trespassing, and Bail Jumping. CI 1950 was cooperating in exchange for consideration on a Green Bay Police drug offense. CI 1950 is now cooperating in exchange for occasional monetary compensation. To date, CI 1950 has been paid $300 in exchange for his cooperation.

*CI 1967*

12. CI 1967 has had an adequate opportunity to directly observe the events discussed and/or has heard conversations directly from the individuals discussed. CI 1967's statements are believed to be reliable as they were both made against his penal interest and later corroborated by information gathered during the course of the investigation. Thus far, the information provided by CI 1967 has proven to be reliable and has been corroborated by, among other things, physical surveillance activities, controlled narcotic buys, and other confidential sources, information obtained from various public databases, and consensually-recorded conversations and other investigative techniques. CI 1967's information has never been found to be false or misleading. CI 1967 is cooperating in exchange for consideration on a case investigated by the GBPD and received $300 compensation for information provided. CI 1967 has a felony conviction along with misdemeanor convictions include; numerous narcotics convictions, and convictions for theft, robbery, burglary, and receiving stolen property.

**RELEVANT FACTS**

13.     In July 2019, The Brown County Drug Task Force (BCDTF) along with the United States Drug Enforcement Agency (DEA), Federal Bureau of Investigation (FBI) and other law enforcement agencies started investigating CARLOS LUIS RAMIREZ-MORALES; M/H; DOB: 11/04/1985, and others known and unknown, concerning possible violations of Title 21 U.S.C. § 846, 841(a), (b)(1)(A) (Conspiracy to distribute and possess with the intent to distribute cocaine and heroin). Soon after, Investigators from the BCDTF and FBI-Green Bay met with the DEA Investigators in Milwaukee who were investigating a drug source named GONZALEZ-COLLADO. An open line of communication, information sharing, along with de-confliction of target subjects was established. It was determined that RAMIREZ-MORALES was the head of the Drug Trafficking Organization (DTO) in Green Bay, Wisconsin and was partially being supplied narcotics (cocaine and heroin) from GONZALEZ-COLLADO in Milwaukee, Wisconsin.

14.     The investigation into RAMIREZ-MORALES to date has included law enforcement methods, including, but not limited to: interviews with confidential sources and sources of information, information from other law enforcement officers; pen register, trap and trace telephone toll data, controlled drug buys, Title III wire intercepts, and GPS locating of target vehicles and physical surveillance.

15.     During the BCDTF investigation into RAMIREZ-MORALES, Milwaukee High Intensity Drug Trafficking Area (HIDTA) took GONZALEZ-COLLADO and members of his DTO into custody. GONZALEZ-COLLADO and members of his DTO were subsequently federally charged with numerous narcotics distribution and conspiracy to commit offenses, along with weapon related offenses.

11 | P a g e

16. Based on my investigation, I have learned that CARLOS LUIS RAMIREZ-MORALES, a.k.a. "Coco" is a Puerto Rican male, born in Mayaguez, PR., on November 4, 1985. RAMIREZ-MORALES's primary residence is at 2811 University Ave. #5 (Subject Premises) in the City of Green Bay, Brown County, State and Eastern District of Wisconsin. This apartment within the apartment building at that address is one of several apartment building that make up the apartment complex known as Royal Oak Apartments. I have been to this location and know that it is more specifically described as set forth above. USPS information suggests CARLOS RAMIREZ and BRIANA PEREZ are residents at that address. Wisconsin Department of Transportation records reflect that vehicles and RAMIREZ-MORALES' driver's license list this as his address. Green Bay Police records indicate RAMIREZ-MORALES listed this address during a traffic stop on July 23, 2019. WI DOC records indicate RAMIREZ-MORALES is currently on supervision for possession with intent to deliver marijuana and lists his address at 2811 University Ave. Apt #5 Green Bay, WI. The cell phone number 920-264-3571 was identified via subpoena as registered to CARLOS RAMIREZ MORALES of 2630 Humboldt Rd. Green Bay, WI. GBPD records detail contacts in September 2018, with RAMIREZ-MORALES during which he provided the address of 2630 Humboldt Rd. and July 2019, when he identified his cell number as (920) 264-3571. This cell number was later the subject of several Wiretap Interception Orders and is known as TARGET TELEPHONE-101. Confidential Informants have utilized TARGET TELEPHONE-101 to contact RAMIREZ-MORALES for the purposes of arranging controlled purchases of narcotics, which were subsequently completed by RAMIREZ-MORALES. Conversations related to drug trafficking have been intercepted between RAMIREZ-MORALES

12 | P a g e

(TARGET TELEPHONE-101) and sources of supply in Milwaukee (GONZALEZ-COLLADO) pursuant to a court authorized wiretap investigation conducted by Milwaukee HIDTA. RAMIREZ-MORALES has the following prior arrests in Puerto Rico: (1) 4th degree felony possession by a person confined in a penal institution or juvenile, of unauthorized telecommunications equipment; (2) Controlled Substance Act – Possessing; and (3) Resisting an Officer.

17. I know that based upon the totality of the investigations to include but not limited to physical surveillance, electronic surveillance and CI intelligence, RAMIREZ-MORALES often utilizes several vehicles in order to conduct drug transactions and transport narcotics, their proceeds, and weapons. Investigators have identified the following vehicles utilized by RAMIREZ-MORALES for purposes of furthering his drug distribution business: (1) SILVER 2014 CHEVROLET MALIBU DISPLAYING WISCONSIN REGISTRATION ABH8190; (2) GRAY 2007 HONDA ODYSSEY DISPLAYING WISCONSIN REGISTRATION AJJ7184; (3) GREEN 1998 JEEP CHEROKEE DISPLAYING WISCONSIN REGISTRATION ADE2324' and (4) BLACK SUZUKI GSX1300 DISPLAYING WISCONSIN REGISTRATION 718NE. All of these vehicles are kept in the parking lot of 2811 University Av., Green Bay, WI and or the garage assigned to 2811 University Av. Investigators have previously obtained tracking warrants on all of the vehicles listed above with the exception of the motorcycle due to the inability to be able to place a tracking device in a covert location on the motorcycle. Tracking warrants were active on the three vehicles during portions of our investigation and confirmed that Ramirez-Morales used them to distribute, obtain, and/or transport controlled substances to further his drug distribution business. I know that based upon physical surveillance and intelligence from CI 1967 that RAMIREZ-MORALES utilizes that Suzuki motorcycle in order to transport narcotics.

**A. CI-1950 Statement and Controlled Buys Involving Subject Premises.**

18.  CI-1950 advised law enforcement that he knows RAMIREZ-MORALES and can purchase controlled substances from him. On September 11, 2019, RAMIREZ-MORALES showed CI-1950 a photo on RAMIREZ-MORALES' cell phone. This photograph was in a text message from an individual labeled "BOBE" who was later identified as JOSEPH J BOBE-VALLADARES; M/H; DOB: 09/11/1992. CI-1950 believed the picture to be approximately five kilos of cocaine and some larger broken chunks. CI-1950 was not sure if the picture was recent, however stated that when CI-1950 was shown the picture RAMIREZ-MORALES was excited about the quality of the cocaine. This lead CI-1950 to believe that this was a recent picture of RAMIREZ-MORALES' cocaine supply.

*September 12, 2019 Controlled Purchase of Cocaine*

19.  On September 12, 2019, CI-1950, under the direction of I, purchased 14.59 grams of cocaine from RAMIREZ-MORALES for $700 in the City of Green Bay, Brown County, WI. The CI previously contacted RAMIREZ-MORALES at 920-264-3571 arranging this purchase.

   a.  At 11:07pm, CI-1950 arrived at 2811 University Avenue and sent RAMIREZ-MORALES a text message indicating that the CI was there. The CI observed RAMIREZ-MORALES exit the common entrance of 2811 University Avenue, a multi-unit apartment building. The CI indicated that RAMIREZ-MORALES motioned to the CI in a way that the CI believed he needed five minutes. The CI stated that RAMIREZ-MORALES then walked to the next apartment building, determined to be 2813 University Avenue. RAMIREZ-MORALES exited this apartment a short time later and met with the CI inside the CI's vehicle.

14 | P a g e

b. The CI and RAMIREZ-MORALES left the parking lot and drove a short distance. During this drive, the CI provided RAMIREZ-MORALES $700 of pre-recorded US currency and RAMIREZ-MORALES gave the CI two baggies containing a chunky a white substance, believed to be cocaine. The CI then dropped RAMIREZ-MORALES back off at the apartment complex.

c. Immediately following this deal, the CI met with I and turned the suspected cocaine over to him. I later weighed and tested the suspected cocaine. I found the cocaine weighed 14.59 grams and observed a positive test for cocaine, a controlled substance.

*October 8, 2019 Controlled Purchase of Cocaine*

20. On October 8, 2019, CI-1950, under my direction, purchased 13.99 grams of cocaine from RAMIREZ-MORALES in the City of Green Bay, Brown County, WI. The CI contacted RAMIREZ-MORALES at 920-264-3571 arranging the purchase of 14 grams of cocaine for $700.

a. At 11:39am the CI arrived at 2811 University Avenue and sent RAMIREZ-MORALES a text message telling him the CI was there. The CI indicated that RAMIREZ-MORALES did not come from 2811 University Avenue and believed RAMIREZ-MORALES may have come from 2813 University Ave. The CI stated that RAMIREZ-MORALES got into the CI's vehicle and the CI and RAMIREZ-MORALES drove a short distance. During the drive the CI provided RAMIREZ-MORALES with $700 of pre-recorded U.S. Currency and RAMIREZ-MORALES gave the CI a baggie containing a chunky white substance, believed to be cocaine. The CI then dropped RAMIREZ-MORALES back off at the apartment complex.

b.  Immediately following this deal the CI met with I and turned the suspected cocaine over to him. I later weighed and tested the suspected cocaine. I found the cocaine weighed 13.99 grams and observed a positive test for cocaine, a controlled substance.

c.  On November 12, 2019 at approximately 1:28pm, DEA agents in Milwaukee Wisconsin, intercepted a cell phone call involving GONZALEZ-COLLADO and RAMIREZ-MORALES (920) 264-3571). During the call, RAMIREZ-MORALES described to GONZALES-COLLADO that the cocaine he obtained and sold to the CI was "strong/powerful. That he wants more. He bought 14 [U/I] and wants 14 more." This is believed to be referencing the controlled buy of 14 grams of cocaine by CI-1950 on October 8, 2019.

*November 13, 2019, Controlled Purchase of Cocaine*

21.  On November 13, 2019, at approximately 10:30am, under my direction, CI-1950 purchased 27.47 grams of cocaine for $1,200.00 from RAMIREZ-MORALES at 2811 University Avenue, City of Green Bay, Brown County WI. CI-1950 had telephone calls and text messages with RAMIREZ-MORALES arranging the purchase, contacting RAMIREZ-MORALES at 920-264-3571.

a.  At approximately 11:09am, N/I Hooper and I observed CI-1950 pull into the parking lot of RAMIREZ-MORALES' apartment building. CI-1950 then sent a text message to RAMIREZ-MORALES and stated that CI-1950 was there. RAMIREZ-MORALES walked from the garage of 2811 University Avenue. The garage door is to the right side of the common entrance door to the apartment building. RAMIREZ-MORALES went to the passenger side of the CI's vehicle and got into

16 | P a g e

the front seat of the vehicle. Contact was also heard over the wire. Physical/visual and electronic surveillance was maintained on the CI and RAMIREZ-MORALES. CI-1950 drove out of the parking lot and turned right onto University Avenue driving a short distance prior to returning to the apartment complex parking lot. While in the car, RAMIREZ-MORALES handed the CI a clear knotted plastic baggy that he had pulled from his front right pocket. The CI handed RAMIREZ-MORALES the $1,200 of prerecorded U.S. Currency. The clear knotted plastic baggy that RAMIREZ-MORALES handed the CI contained a chunky white substance, which the CI believed to be about 28 grams of cocaine.

b. Immediately following this deal, the CI met with me and turned over the suspected cocaine delivered by RAMIREZ-MORALES. I later weighed and tested the suspected cocaine. I found the cocaine weighed 27.47 grams and observed a positive test for cocaine, a controlled substance.

c. Conversation could be heard over the wire between RAMIREZ-MORALES and CI-1950 speaking about money that is owed to RAMIREZ-MORALES from "Christian". CI-1950 later stated that Christian owes RAMIREZ-MORALES approximately nine hundred ($900) for narcotics. RAMIREZ-MORALES stated that he is taking Christian's car to cover the debt. CI-1950 stated that they have also had conversations with Christian about this and knows that Christian is giving the car to RAMIREZ-MORALES because he owes him money.

d. The substance I obtained from the CI had a very strong chemical odor that enveloped the inside of the vehicle. I know, based upon my experience as an investigator, that this odor is consistent with narcotics such as cocaine. The

substance was chunky and consisted mostly of a few larger solid forms and very few small pieces. This would be consistent with my training and experience that persons who distribute narcotics such as cocaine have broken a smaller piece off of a "brick" or kilogram of pressed cocaine to distribute and sell. Later examination of the chunky substance showed a very distinct pressed curve marking on one of the pieces which, from my training and experience, I believe to be part of the "stamp" on the original kilo. I know that drug distributors will press the narcotics such as cocaine into the brick form and will utilize a press and stamp the kilo with the markings of their organization. I believe that the partial curved imprint was part of the original kilo stamping. Based on my training and experience I believe that RAMIREZ-MORALES' supply of cocaine is directly from the original source of supply or possibly one step removed.

*December 5, 2019 Controlled Purchase of Cocaine*

22. On December 5, 2019 at approximately 10:30am, I met with CI-1950 for purposes of him purchasing 28 grams of cocaine for $1,200.00 from RAMIREZ-MORALES at 2811 University Av, City of Green Bay, Brown County WI. CI-1950 had prearranged the purchase of a "zip" or ounce (28 grams) of cocaine. CI-1950 had telephone calls and text messages with RAMIREZ-MORALES arranging the purchase. CI-1950 was contacting RAMIREZ-MORALES at 920-264-3571.

   a. At approximately 10:51am, SA Meyer and I met with CI-1950 at a pre-arranged location. I examined the CI's phone and observed text messages between CI-1950 and RAMIREZ-MORALES that were consistent with arranging a drug transaction.

I provided the CI with $1,200 of pre-recorded U.S. currency and recording equipment.

b. At 11:01am, the CI left the pre-arranged meet location and traveled on University Avenue towards RAMIREZ-MORALES' address of 2811 University Av. At approximately 11:04am, SA Meyer and I observed CI-1950 pull into the parking lot of RAMIREZ-MORALES' apartment complex. CI-1950 then sent a text message to RAMIREZ-MORALES and stated that the CI was there.

c. At approximately 11:13am, RAMIREZ-MORALES was observed by CI-1950 exiting the second doorway, which is a common entrance to the building to the right of 2811 University Av. RAMIREZ-MORALES went to the passenger side of the CI's vehicle and got into the front seat of the vehicle. CI-1950 drove out of the parking lot and made a short circle around the neighborhood and drove back to RAMIREZ-MORALES' apartment building.

d. While in the car RAMIREZ-MORALES handed the CI a clear knotted corner baggy. The CI handed RAMIREZ-MORALES the $1,200 of pre-recorded US Currency. The clear plastic baggy that RAMIREZ-MORALES handed the CI contained a chunky white substance which the CI believed to be about 28 grams of cocaine.

e. Conversation could be heard over the wire between CI-1950 and RAMIREZ-MORALES discussing the quality and source of this cocaine. CI-1950 asked RAMIREZ-MORALES if it (the cocaine) was good and RAMIREZ-MORALES replied "yeah". CI-1950 told RAMIREZ-MORALES that the coke from Philly was the best and they'd buy more of that. RAMIREZ-MORALES tells CI-1950

something similar to "maybe tomorrow, Saturday, Pennsylvania Saturday." CI-1950 asks how much for 2 (ounces of cocaine) and RAMIREZ-MORALES replies two thousand four hundred. RAMIREZ-MORALES states "it's good". RAMIREZ-MORALES tells CI-1950 its "fish, fish scale". Later in the conversation CI-1950 tells RAMIREZ-MORALES that if he gets the fish scale on Saturday, he will buy 2 next week sometime. Based upon my training and experience, I am familiar with the term fish scale and know it to refer to high quality cocaine.

f.  After dropping RAMIREZ-MORALES off at approximately 11:18am, the CI pulled out of the parking lot and then met SA Meyer and I at a pre-arranged location. Once at the meet location CI-1950 turned over the recording equipment to me along with what the CI believed to be the cocaine. The substance had a very strong chemical odor that enveloped the inside of the vehicle which I know, based upon my experience as an investigator, to be consistent with narcotics such as cocaine. The substance was chunky and consisted mostly of a few larger solid forms and very few small pieces. This would be consistent with my training and experience that persons who distribute narcotics such as cocaine have broken a smaller piece off of a "brick" or kilogram of pressed cocaine to distribute and sell.

g.  I took custody of the evidence and it was later transported to the Brown County Drug Task Force for processing. The cocaine was later removed from its packaging and weighed 27.88 grams. The suspected cocaine field tested positive for the presence of cocaine, a controlled substance.

*March 19, 2020, Controlled Purchase of Cocaine*

23.    On March 19, 2020, at approximately 5:00pm, I briefed a controlled purchase of 28 grams of cocaine for $1,300.00 from RAMIREZ-MORALES at 2811 University Av, City of Green Bay, Brown County WI. CI-1950 had pre-arranged the purchase of a "zip" or an ounce (28 grams) of cocaine. CI-1950 had Facebook messages with RAMIREZ-MORALES arranging the purchase. CI-1950 had contact with RAMIREZ-MORALES over Facebook messenger where RAMIREZ-MORALES utilizes the profile of "BLIM MORALES".

   a.   At approximately 5:18pm, N/I McGinty and I met with CI-1950 at a pre-arranged location. I examined the CI's cell phone and observed Facebook messages between CI-1950 and RAMIREZ-MORALES that were consistent with arranging a drug transaction. I provided the CI with $1,300.00 of pre-recorded U.S. currency and recording equipment.

   b.   At 5:21pm, the CI left the pre-arranged meet location and traveled on University Av. towards RAMIREZ-MORALES' address of 2811 University Avenue. At approximately 5:25pm, N/I McGinty and I observed CI-1950 pull into the parking lot of RAMIREZ-MORALES' apartment building. CI-1950 then sent a text message to RAMIREZ-MORALES and stated that the CI was there. RAMIREZ-MORALES did not respond to the text message. CI-1950 called RAMIREZ-MORALES at 920-264-3571 and RAMIREZ-MORALES answered, and the CI told him that the CI was there.

   c.   CI-1950 observed RAMIREZ-MORALES approach the CI's vehicle from RAMIREZ-MORALES' apartment building. RAMIREZ-MORALES went to the passenger side of the CI's vehicle and got into the front seat.

d. CI-1950 left the parking lot and drove a short loop around the neighborhood before driving straight back to RAMIREZ-MORALES' apartment building. While in the car, RAMIREZ-MORALES handed the CI two clear knotted corner baggies that he was holding in his left hand when he got into the car. The CI handed RAMIREZ-MORALES the $1,300.00 of pre-recorded U.S. Currency. The clear knotted corner baggies that RAMIREZ-MORALES handed the CI contained a chunky white substance which the CI believed to be about 28 grams of cocaine. CI-1950 asked RAMIREZ-MORALES if it was good and he told them it was good and mentioned "yellow oil".

e. After dropping RAMIREZ-MORALES off at approximately 5:40pm, the CI left the parking lot and met N/I McGinty and I at a pre-arranged location. Once at the meet location CI-1950 turned over the recording equipment along with what the CI believed to be cocaine, which was packaged in two clear plastic knotted baggies. The white chunky substance was mostly in flaky chunks.

f. I took custody of the evidence and it was later transported to the Brown County Drug Task Force for processing. The suspected cocaine was later removed from its packaging and weighed 27.98 grams in total. The suspected cocaine field tested positive for the presence of cocaine, a controlled substance.

24. On approximately January 6, 2020 and January 29, 2020, N/I McGinty and I met with CI-1967 who identified RAMIREZ-MORALES as an individual who was their supplier of cocaine, heroin, and marijuana. CI-1967 stated that they were able to continue to purchase cocaine from RAMIREZ-MORALES who distributes cocaine in the Brown County area. CI-1967 was shown an unlabeled color photograph of RAMIREZ-MORALES and they

identified the photograph as the male who supplies them with cocaine and is known as "RAMIREZ-MORALES". CI-1967 provided investigators with the telephone number of 920-264-3571 which they use to contact RAMIREZ-MORALES and he uses to contact them, which call detail records confirm. CI-1967 identified 2811 University Ave to be RAMIREZ-MORALES address. CI-1967 stated the next building over (2813 University Ave) is a stash house for RAMIREZ-MORALES. The CI identified BOBE-VALLADARES as the individual who has the stash apartment where RAMIREZ-MORALES keeps his narcotics. CI-1967 has had an adequate opportunity to directly observe the events discussed and/or has heard conversations directly from the individuals discussed.

*June 8, 2020, Controlled Purchase of Heroin*

25.     On June 8, 2020, at 5:30PM, I briefed a controlled buy where CI-1967 pre-arranged the purchase of 14 grams of heroin for $800.00 from RAMIREZ-MORALES at 2811 University Avenue, in the City of Green Bay, Brown County, Wisconsin. The CI pre-arranged the purchase via Facebook audio calls and Facebook Messenger messages with RAMIREZ-MORALES who utilizes the profile of "LEBROM EZAID MORALES". The CI was previously shown an unlabeled color photograph which the CI identified as RAMIREZ-MORALES.

    a. At approximately 6:03PM, N/I Secor and I met with CI-1967 at a pre-arranged location. I searched the CI's person and vehicle for U.S. currency and contraband, both with negative results. The CI was provided with $800 of pre-recorded U.S. Currency and recording equipment. While with Investigators, CI-1967 placed a

recorded phone call to RAMIREZ-MORALES. The CI told RAMIREZ-MORALES that the CI was on the way.

    b. At approximately 6:13PM, N/I Linsmeyer observed RAMIREZ-MORALES walking eastbound in the parking lot of his apartment building (2811 University Avenue Green Bay, WI) carrying, what appeared to be, a plastic grocery bag. N/I Linsmeyer advised that a short time later he observed RAMIREZ-MORALES walking with two other males, a female and a juvenile female westbound through the parking lot towards 2813 University Avenue.

    c. At approximately 6:15PM, I was advised that the CI pulled into the parking lot of the apartment building (2811 University Avenue Green Bay, WI). At 6:16PM, contact was heard over the wireless audio transmitter (wire) speaking what was believed to be Spanish.

    d. At approximately 6:23PM, N/I Linsmeyer observed the vehicle exit the parking lot. Investigators then surveilled the CI to the pre-arranged meet location where the CI met with N/I Secor and I. The CI turned over the suspected heroin to me which was packaged in a knotted clear plastic baggie. The CI advised that the amount appeared to be consistent with what the CI would have expected to receive when purchasing a half an ounce (14 grams) of heroin. I later weighed and tested the suspected heroin. I found the suspected heroin weighed 13.41 grams and observed a positive test for heroin.

*July 22, 2020 Controlled Purchase of Heroin*

26. On July 22, 2020, I briefed a controlled buy where CI-1967 pre-arranged the purchase of 28.6 grams of heroin for $2,000.00 from RAMIREZ-MORALES at 2811 University

24 | P a g e

Avenue, in the City of Green Bay, Brown County, WI. The CI pre-arranged the purchase by contacting RAMIREZ-MORALES on July 21, 2020 and asking how much heroin the CI would receive for $2,000.00. RAMIREZ-MORALES advised he would sell 28 grams for $2,000.00. The conversation pre-arranging the purchase was done via Facebook messages and audio calls with RAMIREZ-MORALES. RAMIREZ-MORALES utilizes the Facebook profile name "LEBROM EZAID MORALES".

    a. At approximately 5:12PM, N/I Secor and I met with the CI at a pre-arranged meet location. I searched the CI'S person and N/I Secor searched the CI'S vehicle and no contraband was located. The CI was provided with $2,000.00 of pre-recorded U.S. Currency along with recording equipment. The CI stated that the CI spoke with RAMIREZ-MORALES at 4:09PM and 4:23PM and RAMIREZ-MORALES stated that the heroin was already prepared. At approximately 5:20PM, N/I Meisner observed the CI arrive at 2811 University Avenue. At 5:21PM, N/I Meisner stated that he heard conversation in Spanish over the wireless audio transmitter (wire). At approximately 5:28PM, N/I Meisner advised the deal was done and approximately one minute later observed the CI leave 2811 University Avenue. Investigators then surveilled the CI to the pre-arranged meet location where the CI met with N/I Secor and I. The CI turned over the suspected heroin over to me which was packaged in a knotted clear plastic baggie. The CI stated that the amount appeared to be consistent with what the CI would have expected to receive when purchasing 28 grams of heroin.

b. While with me and N/I Secor, CI-1967 stated he arrived at the meet location 2811 University Avenue the CI parked in the parking lot. The CI stated that RAMIREZ-

Case 1:20-mj-00733-JRS   Filed 10/06/20   Page 26 of 37   Document 1

MORALES was walking out of the apartment building and that MENDEZ-PAGAN was outside trying to sell RAMIREZ-MORALES stolen clothes. RAMIREZ-MORALES then told the CI "lets do this" meaning the controlled substance transaction. The CI and RAMIREZ-MORALES walked to BOBE-VALLADARES' apartment in the 2813 building by his garage door. RAMIREZ-MORALES opened the garage door and went to a shelf on the left side of the garage and grabbed the heroin off of the shelf. RAMIREZ-MORALES told the CI that he had a lot of heroin left and still owes $8,000.00 for the heroin that he has. RAMIREZ-MORALES then told the CI that he also had marijuana and to ask the CI'S friend if they wanted any. The CI told RAMIREZ-MORALES that the CI had to leave and the CI departed from the address. I later weighed and tested the suspect heroin. I found that the suspected heroin weighed 28.60 grams and observed a positive test for heroin.

**B. Wiretap Interceptions from RAMIREZ-MORALES phone.**

27.     On July 13, 2020, the Honorable U.S. District Court Judge William C. Griesbach signed a federal wire intercept order (Application # 20-AP-3) for RAMIREZ-MORALES cellular telephone number 920-264-3571 for a period of 30 days. The order was served and interception began on July 14, 2020, at approximately 12:20pm. An extension was granted allowing the interception through September 11, 2020 at approximately 5:00 PM. During the interception period numerous pertinent communications between RAMIREZ-MORALES and other individuals were intercepted arranging narcotics transactions at RAMIREZ-MORALES' residence.

28.     On July 14· 2020, a series of text messages were intercepted which stated RAMIREZ-MORALES had sold several pounds of marijuana to an individual who had clients which

26 | P a g e

were unhappy with the quality of the product. RAMIREZ-MORALES stated that selling marijuana always brought problems and questioned whether he should continue. RAMIREZ-MORALES later called Luis CARRION, a drug customer, and stated he needed to immediately purchase a firearm. Carrion told RAMIREZ-MORALES that he can have Carrion's Glock handgun. RAMIREZ-MORALES and Carrion further discussed obtaining a firearm and RAMIREZ-MORALES' large quantity of "grass."

29. On July 15, 2020, at approximately 5:20PM, RAMIREZ-MORALES made an outgoing call to CARRION which was translated and summarized. Carrion tells RAMIREZ-MORALES that he is at a friend's house at 217 Irwin. Carrion tells RAMIREZ-MORALES that he has the gun with him, that he has 75 bullets for the 40 and will give them to RAMIREZ-MORALES. Carrion tells RAMIREZ-MORALES to call him when he gets home.

30. On August 1, 2020, RAMIREZ-MORALES made a phone call to BOBE VALLADARES which was translated and summarized. During the call, RAMIREZ-MORALES advises BOBE-VALLADARES that he expects the package of heroin will arrive today from Texas and to check his mailbox after the postal carrier arrives.

31. On August 13, 2020 at 6:59PM, RAMIREZ-MORALES received a phone call from a drug customer named CARRION-MELENDEZ which was translated and summarized as follows: CARRION-MELENDEZ questions whether RAMIREZ-MORALES only has 100 available. RAMIREZ-MORALES affirms and says he needs all his money. CARRION-MELENDEZ says his friend does have the money complete. CARRION-MELENDEZ asks if that 100 looks big and good. RAMIREZ-MORALES says it's pretty big and it may weigh 1.1. CARRION-MELENDEZ says he will go with Marina right now.

27 | P a g e

CARRION-MELENDEZ makes clear he will not bring people that RAMIREZ-MORALES does not know. CARRION-MELENDEZ confirms he will be there in a half hour. Shortly thereafter, RAMIREZ-MORALES received a phone call from CARRION-MELENDEZ in which CARRION-MELENDEZ says he is outside in front of RAMIREZ-MORALES' door and with Marina. RAMIREZ-MORALES acknowledges. CARRION-MELENDEZ urged RAMIREZ-MORALES to quickly come outside.

32. On August 22, 2020, RAMIREZ-MORALES spoke with Arsenio ROSADO-GOMEZ, an individual who purchased controlled substances from RAMIREZ-MORALES, and told him that a friend (believed to be Jesus Reyes) gave to him a short gun. RAMIREZ-MORALES asked for "seeds" for the 45, meaning ammunition for the handgun.

33. On August 24, 2020, RAMIREZ-MORALES along with wife Briana SEDA-PEREZ and Jose MENDEZ-CAMILLO were physically and electronically surveilled at Cabela's Sporting Goods. Physical surveillance along with the stores surveillance footage shows RAMIREZ-MORALES attempting to purchase a firearm, specifically a FN model 509, 9mm pistol. RAMIREZ-MORALES completed the required Firearm Transaction form. RAMIREZ-MORALES was later denied permission to purchase this firearm because of his prior felony drug conviction.

34. On September 07, 2020, RAMIREZ-MORALES is having a conversation with ROSADO-GOMEZ, and appears to have sent ROSADO-GOMEZ a picture of what appears to be a short barreled assault style rifle with a scope. The two of them have a discussion about how much RAMIREZ-MORALES should pay for it when he purchases the rifle. The following day, ROSADO-GOMEZ told RAMIREZ-MORALES to bring the weapon to work and he will have money. The next day, ROSADO-GOMEZ advised RAMIREZ-

MORALES that his friend will be brining 7-8 short ones (handguns) and RAMIREZ-MORALES advised he will take them in person. RAMIREZ-MORALES and ROSADO-GOMEZ previously discussed obtaining a number of handguns and RAMIREZ-MORALES selling them to a family member making a profit. RAMIREZ-MORALES also advised that his supplier would be bringing more stuff (controlled substances) that he has already purchased.

35. On September 8, 2020, at approximately 7:54PM, RAMIREZ-MORALES received a call from another drug customer named ACEVEDO that was translated and summarized as follows:

   a. ACEDVEDO asks if RAMIREZ-MORALES is loved (ACEVEDO'S way of asking if RAMIREZ-MORALES has product). RAMIREZ-MORALES asks what ACEVEDO wants and he answers white (cocaine). RAMIREZ-MORALES says yes and ACEVEDO asks RAMIREZ-MORALES for a gram. ACEVEDO says he will call RAMIREZ-MORALES later and let him know when he is coming over.

   b. At 9:10PM, RAMIREZ-MORALES received a phone call from ACEVEDO in which he states that he is on his way over.

36. On September 9, 2020 at approximately 9:41am, BCDTF intercepted cell phone calls between RAMIREZ-MORALES and Arsenio Rosado-Gomez. Rosado-Gomez he's on his way to pick "it" up and to give RAMIREZ-MORALES the money. RAMIREZ-MORALES says he has it in the trunk of his car. Rosado-Gomez asks why. RAMIREZ-MORALES replies that he figured that way he doesn't have to go in the morning to the place where he stores it. Based on my training and experience, in addition to my knowledge of this investigation, it is believed this conversation is related to Rosado-

Gomez paying RAMIREZ-MORAELS for either controlled substances or possibly a firearm. During previous conversations, Rosado-Gomez and RAMIREZ-MORALES discussed Rosado Gomez obtaining firearms for RAMIREZ-MORALES for him to sell for profit. On September 9, 2020, Rosado Gomez asked RAMIREZ-MORALES what he was going to do with what Rosado Gomez provided to him because he can't keep it there too long with everything that is going on. RAMIREZ-MORALES said he would take them all that week when he obtains the money. Previous conversations also suggest that RAMIREZ-MORALES obtained a semi-automatic firearm that he intended to sell to Rosado-Gomez. RAMIREZ-MORALES sold controlled substances to Rosado Gomez on a regular basis. This is likely to continue as on this same day, RAMIREZ-MORALES told Rosado-Gomez during an intercepted conversation that he was expecting a quantity of controlled substances that day for which he had already paid the supplier. Thus, these conversations are relevant as it shows that RAMIREZ-MORALES is storing controlled substances and potentially firearms at locations outside of his residence.

37. That same day at approximately 9:04pm, BCDTF intercepted a cell phone call between RAMIREZ-MORALES and Jesus Reyes. Reyes was identified as a supplier of heroin and marijuana for RAMIREZ-MORALES. The following are relevant points from that conversation.

      a. RAMIREZ-MORALES and Reyes talk about a male (believed to be Bobe-Villadares) that knows the code to RAMIREZ-MORALES' safe. RAMIREZ-MORALES advised that he stored things in his (Bobe-Villadares) house and nothing has ever been stolen. Reyes asks about the items stolen and RAMIREZ-MORALES reminds Reyes that he told him about keeping one of the old ones

(pounds of marijuana). RAMIREZ-MORALES advised he also had four pounds of the new one there (in the storage unit). RAMIREZ-MORALES says he had three in his safe at a friend's house close to his house. RAMIREZ-MORALES tells Reyes he took an unnamed items there (storage unit) but took it out and brought it over to his friend's house.

b. Based on my training and experience, in addition to my knowledge of this investigation, I believe this conversation is related to RAMIREZ-MORALES discussing the seizure of marijuana from his storage unit with Reyes. As more fully explained below, I know that on September 8, 2020, BCDTF investigators and other law enforcement executed a search warrant at RAMIREZ-MORALES's storage unit and seized approximately 5.5 pounds of marijuana. During their conversation, RAMIREZ-MORALES and Reyes discuss a male's (believed to be Bobe-Villadares) residence where RAMIREZ-MORALES has stored items in the past without them being stolen. I believe RAMIREZ-MORALES and REYES were discussing whether Bobe-Villardes was involved in stealing the marijuana, obviously unaware it had been seized by law enforcement. RAMIREZ-MORALES also identifies that he has three pounds of marijuana in his safe at an unidentified friend's house, close to his house. I believe RAMIREZ-MORALES is either referencing Bobe-Villardes' residence or Arroyo-Pagan's garage and shows that RAMIREZ-MORALES stores controlled substances at locations outside of his residence and with other associates and also at his residence given his distrust of some associates.

38. On September 11, 2020 at approximately 9:36am, BCDTF intercepted a cell phone call between RAMIREZ-MORALES and Arsenio Rosado-Gomez. The following are relevant points from that conversation.

    a. Rosado-Gomez and RAMIREZ-MORALES discuss the theft of marijuana from the storage unit. Rosado-Gomez asks RAMIREZ-MORALES who else would know that drugs were stored at that location. RAMIREZ-MORALES replied that his friend, who's always with him, knows all about this. RAMIREZ-MORALES also stated he stores some of his stuff at his friend's house.

    b. Based on my training and experience, in addition to my knowledge of this investigation, it is believed this conversation is related to RAMIREZ-MORALES speaking with Rosado-Gomez about storing controlled substance at his friend's house.

39. That same day at approximately 3:15pm, BCDTF intercepted a call between RAMIREZ-Morales and Jesus Reyes. The following are relevant points for that conversation.

    a. RAMIREZ-MORALES tells Reyes that he has about 5 ounces left of the black (believed to be heroin provided previously by Reyes). RAMIREZ-MORALES explains that he owes Jesus about $7,000, and that he's going to give him about $4,900 that he has at home, plus about $500. RAMIREZ-MORALES adds that he has about ¾ of the green.

    b. Based on my training and experience, in addition to my knowledge of this investigation, I believe this conversation is related to RAMIREZ-MORALES admitting that he possessed five (5) ounces of heroin, $4,900 in drug proceeds, and an undetermined amount of marijuana on hand. Given RAMIREZ-

MORALES also admitting that he stores controlled substances at other locations, I believe there is probable cause that controlled substances are at the Subject Premises as well.

40. Based upon the totality of the investigation to date, to include but not limited to several controlled buys of cocaine and heroin, intelligence from confidential informants, wiretap intercepts, electronic and physical surveillance, and search warrants, investigators believe RAMIREZ-MORALES stores narcotics, the resulting money proceeds, and weapons and ammunition within his residence as described above as well as at his garage. Investigators are also aware narcotics traffickers such as RAMIREZ-MORALES will commonly also utilize other locations to store their narcotics, their proceeds and weapons and ammunition in order to insulate themselves from law enforcement.

## AUTHORIZATION REQUEST

41. Based on the foregoing, I respectfully request that the Court issue the proposed search warrant, pursuant to Federal Rule of Criminal Procedure 41 authorizing a complete search of the apartment and detached garage associated with 2811 University Ave. Apartment #5, as further described in Attachment A and to seize items located in Attachment B.

_Ryan M. Meader_    10-06-2020 / 1:06 PM

Ryan M. Meader
Federally Deputized Law Enforcement Officer

Sworn and attested to me by reliable electronic means pursuant to the requirement of Fed. R. Crim.P. 4.1 (Telephone) on this _____ day of October, 2020.

HONORABLE JAMES R. SICKEL
United States Magistrate Judge
Application No.

33 | P a g e

## ATTACHMENT A

IN THE MATTER OF THE APPLICATION FOR A WARRANT AUTHORIZING THE
SEARCH OF APARTMENT #5 AND THE ASSOCIATED DETACHED GARAGE
LOCATED AT 2811 UNIVERSITY AVENUE, GREEN BAY, WISCONSIN. 2811
UNIVERSITY AVENUE IS A MULTI-UNIT APARTMENT BUILDING WITH BRICK
EXTERIOR WITH THE NUMBERS "2811" IN BLACK NUMBERING ON THE EXTERIOR
OF THE BUILDING. APARTMENT #5 IS LOCATED ON THE SECOND FLOOR OF THE
BUILDING. APARTMENT #5 ALSO HAS A GARAGE LOCATED ON THE FIRST FLOOR
OF THE BUILDING. BOTH THE GARAGE AND THE LIVING AREA HAVE A #5, BRASS
IN COLOR AFFIXED TO BOTH THE MAIN ENTRY DOOR INTO THE APARTMENT,
AND THE MAIN ENTRY DOOR INTO THE GARAGE FROM THE COMMON HALLWAY
TO THE BUILDING. THIS PREMISES LOCATION ALSO INCLUDES SEVERAL
VEHICLES AND A MOTORCYCLE SUBJECT TO SEARCH.

## ATTACHMENT B – ITEMS TO BE SEIZED

Violations of Title 21, USC, Sections 841 and 846, as well as federal firearm and money laundering offenses set forth at Title 18 USC Sections 922, 924, and 1956, more specifically, illegal narcotics to include marijuana, cocaine, heroin, methamphetamine and any other controlled substances, paraphernalia associated with the use, storage, distribution, possession and/or manufacture of controlled substances, including but not limited to, scales, drug packaging materials, buyers and sellers lists; containers associated with the storage of controlled substances; various other chemicals, utensils, equipment or apparatus associated with the manufacture of controlled substances; books, articles and commercially printed matter relating to the use, distribution, possession and/or manufacture of controlled substances; and books and records relating to the defendant's manufacture, possession and distribution of controlled substances, including, but not limited to the following:

1) Books, records, receipts, bank statements and records, money drafts, letters of credit and/or other documents relating to financial transactions;
2) Address and/or telephone books and papers reflecting names, addresses and/or telephone numbers;
3) Books, records, receipts, notes, ledgers, photographs, videos and other papers relating to the transportation, ordering, manufacture, possession and/or distribution of controlled substances;
4) Indicia of occupancy, residency and/or ownership of the premises described above, including, but not limited to utilities and telephone bills, cancelled envelopes, keys and lease agreements, loan records and/or any other document which contains indicia of occupancy;
5) U.S. currency and any other financial instruments or proceeds; Records of accounts and transactions involving electronic currency and their platforms, including the keys or recovery codes for associated accounts, transaction confirmations, account statements, communications, and documentation of any transactions or their purpose:
6) United States Postal Parcel boxes, receipts, labels and shipping related items.
7) Counter surveillance devices such as video surveillance systems and radio communications systems;
8) Firearms, ammunition, or other dangerous weapons;
9) Safes and their contents;
10) Electronic equipment and devices, including but not limited to: computers and associated memory storage devices, cellular telephones and pagers, answering machines and caller ID devices, and a forensic examination of any memory data contained therein;
11) For any electronic storage device, computer hard drive, electronic device, or other physical object upon which electronic information can be recorded (hereinafter, electronic storage device) that is called for by this warrant, or that might contain things otherwise called for by this warrant;
    a. evidence of who used, owned, or controlled the electronic storage device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

b.  evidence of software that would allow others to control the electronic storage device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

c.  evidence of the lack of such malicious software;

d.  evidence indicating how and when the electronic storage device was accessed or used to determine the chronological context of electronic storage device access, use, and events relating to crime under investigation;

e.  evidence indicating the electronic storage device user's location and state of mind as it relates to the crime under investigation;

f.  evidence of the attachment to the electronic storage device of other storage devices or similar containers for electronic evidence;

g.  evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the electronic storage device;

h.  evidence of the times the electronic storage device was used;

i.  passwords, encryption keys, and other access devices that may be necessary to access the electronic storage device;

j.  documentation and manuals that may be necessary to access the electronic storage device or to conduct a forensic examination of the electronic storage device;

k.  contextual information necessary to understand the evidence described in this attachment.